*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0477**

State of Minnesota,
Respondent,

vs.

Adam Blaine Davis,
Appellant.

**Filed February 13, 2017
Affirmed
Kirk, Judge**

Marshall County District Court
File No. 45-CR-15-30

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Donald Aandal, Marshall County Attorney, Warren, Minnesota (for respondent)

Todd V. Peterson, Todd V. Peterson, P.A., Sauk Rapids, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Halbrooks, Judge; and Rodenberg, Judge.

# UNPUBLISHED OPINION

**KIRK**, Judge

Appellant challenges his conviction of criminal vehicular homicide, arguing that the district court erred in holding that there was probable cause to believe that he had

committed a crime and that exigent circumstances existed justifying a warrantless blood draw. We affirm.

**FACTS**

At approximately 10:30 p.m. on September 18, 2014, P.G. and his wife, K.G., were driving northbound on Highway 59 near Thief River Falls. Driving conditions were clear and the road was dry. P.G. observed a vehicle ahead of him swerve towards the ditch and flash its taillights as a southbound vehicle swerved into the northbound lane, colliding with the vehicle. P.G. pulled over behind the northbound vehicle, and K.G. immediately called 911. P.G. checked on the driver of the northbound vehicle, B.O. P.G. was unable to open the door of B.O.'s vehicle. K.G. stayed with B.O., and P.G. went over to the southbound vehicle and spoke with the driver, appellant Adam Blaine Davis. In his statement to law enforcement, P.G. stated that appellant was able to talk, but that he was not making "much sense." P.G. thought appellant was drunk. P.G. asked appellant if he had been drinking, and appellant repeatedly stated, "I'm innocent[,] officer[.]" P.G. was unable to remove appellant from his vehicle.

Law enforcement arrived on the scene in less than five minutes. Thief River Falls Police Officer Hart was one of the responding officers at the scene. In a supplementary report, Officer Hart stated that it appeared that the vehicle driven by appellant had crossed the centerline and struck the vehicle driven by B.O. Officer Hart attempted to render aid to the drivers and spoke with four witnesses at the scene, including P.G. B.O. died shortly after being transported to the hospital.

2

Respondent State of Minnesota charged appellant with one count of criminal vehicular homicide—operating a vehicle with negligence and under the influence of either alcohol or a controlled substance. Appellant moved to suppress the results of the blood draw, arguing in part that the search violated his Fourth Amendment rights.

At the first contested omnibus hearing, Minnesota State Patrol Trooper Scott Stueber testified that he responded to the accident and found a chaotic scene with firetrucks, ambulances, and "people everywhere." Three months after the accident, Trooper Stueber drafted a field report describing the accident scene. In the report, he stated that the collision occurred at a slight curve in the road and that appellant's vehicle failed to follow the curve and came into the northbound lane. Trooper Stueber described B.O.'s vehicle as "straddling the east fog line with severe front end damage." There was a skid mark in front of B.O.'s driver-side rear tire indicating that the vehicle's brake was engaged at impact. Trooper Stueber could not see any skid marks leading up to the point of impact from appellant's vehicle. Trooper Stueber's field report was not admitted into evidence at the hearing.

Marshall County Sheriff's Deputy Cody Gillund testified that he arrived at the scene at 10:56 p.m. He was then instructed to go to Sanford Hospital in Thief River Falls to meet with Trooper Stueber. Deputy Gillund arrived at the hospital at 11:10 p.m. and proceeded to the emergency department. A physician informed him that B.O. had died of her injuries. Deputy Gillund testified that appellant was being treated by numerous hospital staff, and there was a "steady flow of nurses in and out" of his room. One of the ambulance personnel who treated appellant told Deputy Gillund that he believed appellant smelled like alcohol.

3

Deputy Gillund also learned that hospital staff planned to airlift appellant to either Minneapolis or Fargo, North Dakota for medical treatment.

Deputy Gillund called Trooper Stueber and told him that appellant would be airlifted and that the ambulance personnel believed that appellant smelled of alcohol. Trooper Stueber advised Deputy Gillund to request that hospital staff draw a sample of appellant's blood. Thief River Falls Police Officer Scott Mekash testified that he brought a blood kit to Deputy Gillund at the hospital. As Officer Mekash stood approximately eight feet away from appellant's hospital room, he smelled an odor of alcohol coming from the room. He told Deputy Gillund about the smell of alcohol.

Trooper Stueber testified that he told Deputy Gillund to take a blood draw because he did not think that there was enough time to get a search warrant. Under cross-examination, he admitted that he had "zero experience" in obtaining a telephonic warrant, but that he could have figured out how to do it in time if he had to. Trooper Stueber insisted that he did not believe that there was enough time to get a search warrant before appellant was airlifted to another hospital.

Deputy Gillund testified that he did not administer the Minnesota Motor Vehicle Implied Consent Advisory to appellant because he did not want to interfere with his care given "the mass flow of hospital personnel in and out" of appellant's room. Deputy Gillund was uncertain whether he would be able to stand next to appellant to administer the advisory. He testified that he did not seek a search warrant because he did not believe that there was enough time before appellant was airlifted.

4

At 11:45 p.m., approximately one hour and fifteen minutes after the crash, a nurse collected a sample of appellant's blood as the helicopter crew prepped appellant for transfer to a hospital in Fargo. Deputy Gillund testified that initially the nurse explained to him that she could not to get a second tube of appellant's blood "because [the helicopter crew was] taking him." But "something happened" and the nurse was able to get a second blood draw at 11:50 p.m. Within 15 minutes of the second blood draw, appellant was airlifted to Fargo. Chemical testing of appellant's blood revealed the presence of amphetamine, methamphetamine, and morphine.

After the first contested omnibus hearing, the district court granted appellant's motion to dismiss. It concluded that exigent circumstances existed, as the facts of the case were similar to *State v. Stavish*, but the state failed to prove that there was probable cause that appellant had committed a crime. 868 N.W.2d 670, 672-74 (Minn. 2015). The district court found that the state failed to introduce any eyewitness testimony and it failed to submit the police or investigative reports into the record to establish that appellant negligently collided into B.O.'s vehicle.

The state moved the district court to reconsider its order suppressing appellant's blood draw, and, after a telephonic hearing, the court granted the state's motion. A second contested omnibus hearing was held, and the state submitted a *Florence* packet in support of probable cause. P.G. and K.G. also testified.

Following the second hearing, the district court issued an order concluding that there was probable cause to believe appellant had committed the crime of criminal vehicular homicide. It found that Officer Hart's report established that appellant's vehicle had

5

crossed the centerline and struck B.O.'s vehicle. It also found that law enforcement was informed of P.G.'s observations at the accident scene. It further found, based on Trooper Stueber's field report, that appellant "failed to negotiate a curve in the road and struck [B.O.]'s vehicle" and that appellant's vehicle did not leave any skid marks at the accident scene.

The parties stipulated to the state's case under Minn. R. Crim. P. 26.01, subd. 4, in order to obtain appellate review of the district court's denial of appellant's suppression motion. The parties also agreed that if the district court found appellant guilty, the state would recommend a 75-month prison sentence. The district court found appellant guilty of criminal vehicular homicide and sentenced him to 75 months in prison.

This appeal follows.

## D E C I S I O N

When reviewing pretrial orders on motions to suppress evidence, this court may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing the evidence. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992). We review the district court's factual findings for clear error and its legal conclusions, including determinations of probable cause, de novo. *State v. Horst*, 880 N.W.2d 24, 33 (Minn. 2016).

"[T]he constitutional prerequisite to the warrantless nonconsensual removal of blood of a conscious or unconscious person is the same: probable cause plus exigent circumstances." *State v. Aguirre*, 295 N.W.2d 79, 81 (Minn. 1980). A probable cause determination involves a practical, common-sense decision given all of the circumstances,

whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Lieberg*, 553 N.W.2d 51, 55 (Minn. App. 1996) (quotation omitted). The inquiry is objective, not subjective. *See State v. Riley*, 568 N.W.2d 518, 523 (Minn. 1997).

> **A.    There was probable cause to believe appellant committed the crime of criminal vehicular homicide.**

Appellant argues that the district court erred in concluding that the warrantless blood draw was supported by probable cause because there was insufficient evidence to believe appellant had driven negligently. He challenges the district court's reliance on facts that he alleges were not established before his blood was drawn, specifically those found in Trooper Stueber's police report documenting the position of the vehicles on the road and the skid marks left at the accident scene. He also points out that the record is unclear whether P.G. and K.G. spoke to law enforcement about their observations before the blood draw.

Criminal vehicular homicide arising from the negligent operation of a motor vehicle while under the influence of alcohol and/or a controlled substance is a crime. Minn. Stat. § 609.2112, subd. 1(2)(iii) (2014). Relevant to this appeal, the state must prove under the statute that appellant caused the death of a human being as a result of operating a motor vehicle in a: (1) grossly-negligent manner, or (2) in a negligent manner while under the influence of any combination of alcohol or controlled substance so long as the alcohol concentration is at least 0.08 or more, as measured within two hours of the time of driving. *Id.*

7

We have held that there is probable cause of criminal negligence resulting in death when there is a fatal accident and evidence that the driver was drinking and inattentive. *State v. Speak*, 339 N.W.2d 741, 745 (Minn. 1983). "Evidence of a defendant's drinking is but one of many factors that bears on a determination of the issue of whether the defendant is guilty of the crime of criminal negligence." *Id.* A law enforcement officer does not need to observe any outward indicia of intoxication in order to have probable cause to believe that the defendant is intoxicated. *See State v. Lee*, 585 N.W.2d 378, 382 (Minn. 1998). Rather, the probable cause that is required for a warrantless, nonconsensual blood draw is probable cause to believe the defendant has committed a crime and probable cause to believe that the administration of a blood-alcohol test will result in the discovery of evidence relevant in the prosecution of that crime. *Speak*, 339 N.W.2d at 745.

Here, given all of the circumstances, we conclude that there is probable cause to believe that appellant committed the crime of criminal negligence resulting in death. *Id.* at 381. At the scene, both drivers were injured, and B.O. died from her injuries prior to appellant's warrantless blood draw. Officer Hart examined the crash scene, and it appeared to him that appellant's vehicle had crossed the centerline and struck B.O.'s vehicle. At the time Officer Hart made this observation, appellant was still at the scene of the accident. The district court properly found that Officer Hart's report corroborated P.G.'s testimony that appellant repeatedly told P.G. that "he was innocent," despite the fact that P.G. was not a law enforcement officer. P.G. also reported that appellant was acting drunk at the collision scene and that he slurred his words. Additionally, an ambulance crew member and Officer Mekash reported smelling alcohol on appellant. This evidence suggests

8

negligent driving by appellant, "the sort of inattentive driving indicative of [a] defendant being under the influence of alcohol." *Id.* at 383. The collision also occurred at approximately 10:30 p.m., a time of day when an accident involving drinking is likely to occur. *See State v. Storvick*, 428 N.W.2d 55, 60 (Minn. 1988) (noting that a collision involving a pedestrian and a driver suspected of drinking that occurred at approximately 9:00 p.m. occurred at a time of day that drinking-related accidents occur). Taken together, these facts support a finding of probable cause. While chemical analysis of appellant's blood revealed the presence of drugs, but no alcohol, the facts establish that there was probable cause to believe appellant had committed a crime at the time his blood was drawn. *See State v. Fawcett*, 884 N.W.2d 380 (Minn. 2016). Although the district court erred in relying on Trooper Stueber's report, which was filed three months after the collision and does not indicate when he made his observations, we still conclude that there is sufficient evidence to show to a degree of reasonable probability that appellant had committed criminal vehicular operation or homicide. *Lieberg*, 553 N.W.2d at 55.

### B. Exigent circumstances were present.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. A warrantless search is reasonable only if it falls within a recognized exception to the warrant requirement. *Missouri v. McNeely*, ___ U.S. ___, ___, 133 S. Ct. 1552, 1558 (2013). One established exception is the presence of exigent circumstances. *Stavish*, 868 N.W.2d at 675. Exigent circumstances exist when "there is compelling need for official action and no time to secure a warrant." *Id.* (quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949

9

(1978)). "The [s]tate has the burden of showing that exigent circumstances justified the search." *Horst*, 880 N.W.2d at 33.

Appellant raises three challenges to the district court's finding that exigent circumstances existed. First, he argues that exigent circumstances did not exist because law enforcement did not need to take his blood within a two-hour window to prove that he committed criminal vehicular operation caused by gross negligence. Second, appellant argues that the record establishes that law enforcement had ample time to obtain a telephonic search warrant. Third, he argues that there is no evidence that he would become unavailable for a blood draw.

In determining whether a law enforcement officer faced an emergency justifying acting without a warrant, this court examines the totality of the circumstances by objectively evaluating the facts reasonably available to the officer at the time of the search. *Stavish*, 868 N.W.2d at 675. *Stavish*, a recent opinion from the Minnesota Supreme Court, is instructive in analyzing the circumstances supporting exigency. *Stavish* involved a single-vehicle rollover crash that resulted in the death of the passenger and serious injuries to the defendant, who was the driver. *Id.* at 672. Prior to a blood draw, the defendant admitted to law enforcement that he was the driver of the vehicle and that he had been drinking. *Id.* at 673. Fifty minutes after the crash, a nurse took a warrantless blood draw of the defendant's blood under the direction of law enforcement. *Id.*

The supreme court relied on the following circumstances supporting exigency: (1) there was a single-vehicle accident involving a fatality; (2) the driver was seriously injured; (3) the driver, who had been transported to the hospital, would possibly be airlifted

10

to another hospital; (4) alcohol was involved in the accident; (5) multiple medical personnel were attending to the driver; (6) the officer did not know how long the driver would be at the hospital or whether "further medical care would preclude obtaining a sample"; (7) federal and state privacy laws limit the amount of information that the officer could discover about the driver's medical condition; and (8) the officer was attempting to get a blood sample within a statutory two-hour period. *Id.* at 677-79.

All of the circumstances supporting exigency in *Stavish* are also present in this case. Appellant was a driver involved in a fatal motor vehicle accident and was seriously injured. He was being prepped for transport by a helicopter crew to an out-of-state hospital and multiple medical personnel were treating appellant before he was airlifted. Deputy Gillund only knew that appellant was likely to leave the hospital within a very short time, and he did not think he could administer the implied-consent advisory given the number of medical personnel attending to appellant in the emergency room. And the window of time available to obtain a blood sample was even more limited than in *Stavish* because appellant's sample was obtained 75 minutes after the collision. Time was of the essence in drawing appellant's blood within two hours of the accident to ensure the reliability and admissibility of any alcohol-concentration evidence.

Contrary to his claim, the results of appellant's blood-alcohol test were very important to the offense he was charged with. Criminal vehicular homicide can be proved by evidence of driving in a negligent manner while under the influence of alcohol, with an alcohol concentration of 0.08 or more as measured within two hours of driving, or under the influence of controlled substances. *See* Minn. Stat. § 609.2112, subd. 1(2) and (4). At

11

the time appellant's blood was drawn, a chemical analysis of his blood was relevant to which subpart he could be charged under. And an officer may reasonably believe that an emergency exists where the delay necessary to obtain a warrant will result in the destruction of evidence. *Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835 (1966).

The district court did not err in finding that there was not sufficient time to get a telephonic warrant. *Stavish* does not consider the availability of a telephone search warrant as a factor in the exigency analysis. Here, the record evidence demonstrates that at the time Deputy Gillund was instructed to get a blood draw, hospital staff had already determined that appellant needed to be airlifted to another hospital. Any additional delay could have prevented law enforcement from getting a sample of appellant's blood. Further, appellant was being transferred to a hospital in a different state, and he would be unavailable for a blood draw.

For these reasons, exigent circumstances existed at the time of the blood draw, and the district court did not err in declining to suppress the blood-test evidence.

**Affirmed.**